Good morning, your honors. My name is Tyler White. I'm a third-year law student at Chabot University School of Law. I'm here under the supervision of Professors Peter Frasiabi and Kim Penfill. Nice to have you with us here this morning. Great. It's great to be here. With my colleagues Ben Rubin and Elyse O'Brien, we have appointed pro bono counsel to the petitioner in this matter, Mr. Roberto Gomez. The BIA error should be reversed for two reasons. First, Mr. Gomez was not a persecutor. Second, because he was persecuted in the past, and appears even worse if returned to Peru, should be granted relief under the CAT. This court recently published the Miranda opinion, holding that a Peruvian military interpreter who knowingly played an integral role in the persecution of others is statutorily knowledgeable for asylum. Our case is distinguishable from Miranda on the facts alone. Mr. Miranda spoke both Spanish and Quechua. He was one of few military agents who could do so. Without his services, persecution could not have occurred. This court correctly held that Mr. Miranda played an integral role in the persecution of others. Mr. Gomez, on the other hand, did not play an integral role in persecuting others. Without his intelligence gathering, rogue military agents would still have committed extrajudicial killings. Persecution. I didn't understand that. Without his intelligence gathering? Rogue military agents would still have committed extrajudicial killings. Well, probably so, but I don't see how that makes any difference. The fact is, if he's going out and fingering people, knowing that the military is likely to or might very well torture and kill those people, it doesn't matter if they would kill people anyway. I mean, that sounds like an Eichmann defense. Well, they'd have gotten somebody else to do the shipping if it weren't me. That's right, Judge Fernand. But Mr. Gomez did not know that his intelligence gathering would lead to persecution. Nothing in the record shows. Well, sure he did. He knew that the people that the military brought in because they were allegedly subversive, which might mean they were shining path and just they didn't like the regime, had a fairly decent chance to get themselves cut to pieces and killed. Yes. He says he knew that he he he does say he knew about people about the military committing atrocities. But there is no evidence linking his intelligence gathering and those that were persecuted. Well, no, except he knew that they did that to people who were considered to be rebels, rebels or people who are considered to be shining path. And he was going and saying, that guy is a shining path. That kind of shiny path. That guy is doing bad things. What do you think they were going to do? Oh, well, it's OK. As long as you've numbered them, as long as you fingered and we don't touch those guys. Nobody thought was going to happen. No. But the the the Peruvian military as a whole is not performing these persecuted persecutory acts. It was the record only shows that rogue agents were committing these these killings, these persecutions. Agents such as Commander of Arrestees and Colonel Napuri. So when Mr. Gomez reported on the shining path, there's just nothing that shows these people were persecuted or that the legitimate government function was to persecute these people. In finding Mr. Gomez was a persecutor, the BIA erred in three significant ways. First, there's no evidence in the record that Mr. Gomez persecuted anyone, like I said. And by extension, there's no evidence that he persecuted anybody. I want to protect the classes on pages 147 through 148 of the record. Mr. Gomez said, quote, I never participated in actions of killing and quote, I never killed anyone. Rogue members of the military did commit these killings. But there is no evidence that Mr. Gomez killed these people. Interpreter never. Interpreter never tortured anyone like he didn't even believe in it. And he never killed anyone. Interpret the differences. The interpreter knew that his actions led to the persecution. In fact, the IJ in in the Miranda case said that without the interpreter, the persecutions would not have occurred. And this court agreed that. Well, then you just tell me. Can you just say a minute ago? Well, if hadn't been that interpreter, they've got another one. Well, the answer has had nothing to do with one interpreter. They find somebody else and they still go on with their atrocities. So I think he said that. I did say that. But the Miranda opinion alludes to the fact that the interpreter was a specialized skill, presumably learning another language is harder than training someone to gather intelligence. And we know that he just knew the language. He happened to be a native speaker, I believe. Yes. And which is exactly why he was so he played such a key integral role in in the persecution. Secondly, the BIA erroneously imputed the Peruvian military's motives to Mr. Gomez. The BIA found Mr. Gomez culpable because he belonged to the military. But first of all, the military as a whole was not engaged in acts of persecution. Only certain members of the military were engaged in these acts. Secondly, Kluge, the Ashcroft expressly held that I thought the intelligence department was doing those things. And he was part of the intelligence department. Is that wrong? He was part of the intelligence department, but the intelligence department as a whole was not committing these acts of persecution. There was only certain members of the intelligence department. How do you deal with this testimony that says he's asked about the killings and he says, yes, I was a witness. I was a witness of many deaths of the workers in the area that the military service would detain in a day or a couple of days later. Their bodies would appear in different areas. What do you make of that? I think that the government has misconstrued the record and I think the BIA has misconstrued the record there as well. When read in context, it's he's he's alluding to the fact that he witnessed the aftermath of these atrocities. He saw these, for example, he saw three human heads and then he later saw them displayed. But he never actually witnessed any killings. He never actually assisted in any killings or persecutions. You know what weakens that argument, though, Mr. White? If he if he didn't know what was going to happen and he didn't see, then he saw and he continued to do it. Don't you have a little problem? Well, the fact remains that he still didn't know that what he did led to the killings. I mean, in fact, in fact, he himself was threatened to be killed. He very well could have been one of those human heads. The government weren't just after the shining path. These these rogue military agents were after people that were potential whistleblowers, members of their own. So it wasn't just the shining path that the government was after. Don't you don't you have a stronger point you might want to argue? What about his fear of torture if he returns? OK, thank you. Mr. Gomez does have a legitimate fear of torture if returned and he qualifies for a leap under the cat. He fears that he will suffer an inhumane and torturous death if returned to Peru. Why? Page 145 of the record indicates that other agents who have divulged the same information that Mr. Gomez has since testified about were cut into pieces. Page 139 of the record shows that Commander Versteeg for the second time threatened Mr. Gomez's life and said, quote, I will kill you. Certainly dismemberment and murder both must qualify as torture under the cat. Well, murder is not torture. I mean, we know that. OK. Dismemberment. Well, after you're dead, dismemberment is is it's got to be torture after you're dead. Not after you're dead. I said dismemberment or torture, dismemberment or murder. Yeah. But we have no evidence that they dismember people before they kill them. Well, we have evidence that people were cutting the pieces. Yeah. I don't know whether that happened before or after they were dead. But he he it's his burden of persuasion, is it not? Yes, it is. Cut into pieces after they're dead. That doesn't sound much like torture. Let me ask you. If he is a persecutor, he's not entitled withholding under cat. Correct. Well, not according to the footnote seven and Miranda, but not according to the footnote seven in the Miranda opinion. Well, not according to the regulations. He's not right. Entitled withholding under cat. Right. Not not according to the regulations. You're right. But the footnote seven of the Miranda opinion does say that even if he was found to be a persecutor, he is entitled to cat relief. Right. He might be entitled to deferral. Right. Do you want to say that sometime for a bottle? I have 30 seconds left. I just want to wrap up real quick, I guess. OK. He he was threatened by the military. He received several death threats. He escaped an assassination plot where military men broke into his house with machine guns, shot up the place. He knew it was the military because he traced the license plate of the car back and found it was Colonel Napuri. Colonel Napuri told him he'd harm him if he furthered the investigation. He was his life was threatened. His parents, his wife, they were both threatened to discover his whereabouts. The military quite simply persecuted Mr. Gomez. Thank you very much. We'll hear from the government. Miss Miles. Good morning, Your Honors. I'm Erica Miles and I represent Respondent Alberto Gonzalez in this matter. Mr. Gomez is in fact statutorily barred from asylum and withholding of removal under the act and cat because he did assist in the persecution of others in Peru when he worked for nine years as a military intelligence informant and agent. The Board of Immigration Appeals concluded that he failed to meet his burden of proof that he did not assist in persecution. And this conclusion is supported by substantial evidence and does not compel a contrary conclusion. Mr. Gomez, what's your best evidence that he directly participated or that any of his intelligence directly resulted in the death or torture of someone? Well, Mr. Gomez admitted that he infiltrated factory and universities tasked with gathering information. He provided this information to his superiors and he stated that he witnessed the ordering of killings by his superiors. Based on these admissions, the burden was then shifted to Mr. Gomez to prove and to present evidence that he did not assist in persecution of others. And substantial evidence shows that he failed to meet his burden. There was no adverse credibility determination, right? No, the board concluded that the immigration judge did not make an adverse credibility finding. So we presume his testimony is truthful, correct? Based on this record, the court would deem his testimony as truthful. So when he says he didn't participate in the killings, we have to accept that, right? Yes. So where does that leave you? Well, his intelligence gathering did in fact, does meet the definition under the Miranda Alvarez case that he assisted in the persecution of others because his assistance was material and in furtherance of his superior's goals in identifying and eliminating all political opponents. Would you concede that on this record, there's no direct evidence that any intelligence that he gathered resulted in the death or persecution or torture of someone? Well, there's direct evidence that intelligence gathering such as his did in fact lead to the torture and killing of workers and students and a university dean. You're answering my next question. My first question is there's no direct evidence that shows causality between anything that he did and any death, torture or persecution of another. Is that right? This is true, but he has to submit. Let me ask my next question then. So what you have is an indirect evidence. Essentially, you're saying people, intelligence like his. Why does that shift? We have the sort of strict causality cases where we say membership in a group is not enough. Then we have Miranda, which gets a little closer and the interpreter case, which is that causality. This seems to be sort of in the middle. Why should we adopt a rule that if you are a member of an intelligence gathering organization and the results of some other intelligence gathering results in torture, that that qualifies under this provision of persecuting others? Because intelligence gathering itself is integral to the military's role in being able to fulfill their particular goal in identifying all political opponents. But for intelligence gathering type of services provided by these military agents, they would not be able to fulfill their goal in arbitrarily killing anybody that is suspected of being a political opponent. Moreover, Mr. Alvarez in his asylum application even stated that he went to a field with a group of agents to capture subversive elements, obtain information by any means and eliminate the element. He also stated that his job was to look and research information on the enemy and the information is used to destroy the enemy. He admitted in his application that he knew for a fact that the intelligence gathering that he did and possibly even participation in elimination of the element did in fact lead to the killing of others. Regardless, intelligence gathering is absolutely critical and integral for his superiors to identify and eliminate political opponents. Moreover, this was on account of their political opinion. None of the people that were killed, according to Mr. Gomez's testimony and application, were armed in the middle of any sort of civil strife. No one was accused of terrorist activities or particular crimes. They were arbitrarily killed because they were just merely suspected of having different political opinions. In his asylum application, he characterized the information gathering as political in nature. In his opening brief, he said that this was not civil strife situation. It was in fact on account of people's political opinion, as the Miranda Alvarez court even distinguished under similar circumstances. This was not on the battlefield type of killings. It was more similar to an ethnic cleansing type of motive from the Peruvian military's actions here in seeking out and to eliminate subversive elements. You know, we had a whole, I don't know, hundreds and hundreds of cases involving the Shining Path, where the allegation was that the government couldn't control the Shining Path, and therefore people were entitled to asylum in the United States because of the actions of the Shining Path. It just seems somewhat ironic that we would say as a matter of, I guess, strict liability, if you will, that anybody who joins the government action to try to gain intelligence about them could not seek asylum in the United States, because they would be guilty of persecution of this group that we say persecuted others. Well, in this situation, Mr. Gomez was completely aware of what was going on, he knew. And he stayed with the military for nine years doing intelligence gathering or analyzing. And the only time he requested a transfer was because he thought that his own undercover identity would be found out by the Shining Path members. He did not request a transfer because he found what his superiors were doing to be so repugnant that he couldn't participate in it anymore. Ms. Miles, I don't think you heard his question. Did you? His question premised that there was a move to destroy the Shining Path, as I understand it. He's saying why, if a person who goes to protect the government from the Shining Path, for persecution of the Shining Path, should then forfeit any right to seek relief? Well, in this case, there was... You're saying it's because he did it. Well, yes, he did it. But don't you have to take the next step? Why should that preclude him from asking for relief? Those aren't the facts of this case. The facts of this case is that nobody in the Shining Path that Mr. Gomez testified was killed, nobody was accused of actually being a persecutor themselves. They were, as he described, innocents, students, and workers. So his intelligence gathering was not against suspected persecutors themselves. It was just against those suspected of having a different political opinion. He had the investigation, if I recall the record correctly, of some people who were going to murder a factory worker, and his intelligence stopped that, right? So these weren't all innocents that you're talking about. Correct. But he did in fact say... My broader question is, I guess I suppose is this, you seem to be arguing that if anyone is a member of the military intelligence in Peru, or was a member of the military intelligence in Peru during this period of time, if they're a member, they're not eligible for asylum in the United States, isn't that what you're... No, that is not. Because you're saying he was a member of military intelligence, other people in military intelligence gathered information that resulted in the elimination of other people, therefore he's ineligible. That's your argument, isn't it? No, my argument is not that every member of the Peruvian military would be accused of assistance in persecution. The distinction here is similar to that of the interpreter. His role was integral to the military's goal in eliminating all political opponents. It was integral because without that type of information gathering, they could not identify and kill them. And it is also similar to the interpreter because he was very aware of the fact that his intelligence gathering led to the killings of these people. And once he became aware of it, he did not try to stop his activity. Thank you very much for your argument, both of you. And thanks for taking on the case pro bono, and thanks for traveling out here from D.C. to make your argument. The case we just heard will be under submission. It was a good argument on both sides, I guess. You can give your dean my regards. He taught me in a seminar before you were born in New Orleans back in the old days when he was in a different place at a different time. Thank you very much.
judges: Farris, Fernandez, Thomas